[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff in this case, Jennifer Benedetto, and the defendant, William Wanat, entered into an Indenture Agreement on December 6, 1997, for the lease of premises at 348 Black Rock Turnpike in Fairfield, Connecticut, owned by the defendant. It would appear from the uncontested testimony that the plaintiff was not the real party in interest but was acting on behalf of her father, Stanley Benedetto, who was the principal in all the negotiations and dealings both before and after the lease signing.
Stanley Benedetto, a former State Police Officer, went into the restaurant business in 1981 when he acquired a partial interest in Danny's Drive-In in Stratford, Connecticut. Prior to 1997, he also had an interest in Lenny's Dog House and the Stratford Pizza which he had disposed of. He was always interested in getting involved in a sit down restaurant and, as early as 1993, had meetings with Victor Klein and Richard Girouard, restaurant brokers, in pursuit of that goal. They showed him several available restaurants but he did not purchase any of them.
Benedetto had developed a concept for a restaurant to be called "The Legends." He viewed properties in Fairfield and came upon the defendant's property. He then approached the defendant to propose that he build a restaurant on his property that Mr. Benedetto would lease. He then introduced Mr. Girouard into the negotiations and at least at that time Mr. Girouard appeared to be working for both Mr. Wanat and Mr. Benedetto. This first meeting took place in early 1997. Mr. Girouard did site and building plans for both parties, charging Mr. Benedetto $5,000 and Mr. Wanat $21,000. By the time the lease was signed, Mr. Girouard appeared to have accepted the job of project coordinator for Mr. Wanat.
The parties continued to negotiate the terms of their agreement until it was concluded on December 6, 1997. In between, they both worked with Mr. Girouard on the feasibility and design of a restaurant on the property. Mr. Benedetto testified that his daughter signed the agreement CT Page 9811 because as the titleholder of the family residence in Stratford she had collateral to secure the agreement. She would have no role in running the business. Mr. Benedetto testified that the defendant, 30 to 45 days before the lease signing on December 6, 1997, stated that he would have the building up and ready for occupancy by April 1, 1998. That was important to Benedetto and it was the start date for rental payments under the lease.
As a result of that representation, Mr. Benedetto put his former business, Danny's Drive-In, up for sale so he would be able to give his full attention to Legends of Fairfield in April of 1998. He sold Danny's on March 7, 1998, for $450,000, which after the payment of taxes and bills netted him $152,000 in cash and a note for $206,000 payable at $5000 per month. That deal also involved his daughter Jennifer as the straw person.
The terms of the Lease Indenture (plaintiff's exhibit 1) provided for an initial five year lease term at $4,000 per month and three additional five year options at rent to be later negotiated. An additional term in paragraph 37 called for the lessee to pay a non-refundable deposit of $100,000 to be used for construction costs. It also provided that if the cost of building construction exceeded $300,000, the rent would increase. There was also included an option to purchase the property at fair market value, in no case to be less than $600,000. The $100,000 non-refundable deposit would be credited against that purchase price. The plaintiff paid the $100,000 on the signing of the lease.
Problems began to develop almost immediately that caused delays. Initially, there were two appeals from the approval of the project by the zoning authorities in Fairfield. Then a water table problem surfaced which required changing the location of the building on the property and a new design. Construction of the building had not even begun as of April 1, 1998, the date the building was supposed to be completed.
Because he had no income because the restaurant had not opened, Mr. Benedetto approached Mr. Girouard in March of 1998 to look for another restaurant property. As a result, Mr. Girouard showed him the Arizona Flats restaurant which was for sale for $350,000 with a required down payment in cash of $175,000. Benedetto had only $105,000 and he claims Girouard suggested that he try to borrow the rest from Mr. Wanat. Mr. Benedetto did ask and Mr. Wanat loaned him $70,000. There was no note or any writing memorializing the loan. There was no interest rate discussed and no time established for repayment. Mr. Wanat testified he expected to get repaid quickly, but he has nothing to support that. Be that as it may, Mr. Benedetto did repay $45,000 of that loan some time in July of 1998. Mr. Benedetto did conclude the purchase of the Arizona Flats CT Page 9812 restaurant and almost immediately began to manage it.
As a result of the water table problem and the relocation of the building on the property, Mr. Benedetto required a change in the plans which would substantially increase the cost of construction. Thereafter, the parties executed an Amendment to the lease dated April 20, 1998. This amendment was also guaranteed by Stanley Benedetto and his wife Norine. The main changes in the amendment were to increase the rent for the first five years to $5,400 monthly, to increase the option purchase price to $750,000 and to eliminate the clause calling for rent increases if construction costs exceeded a particular figure. Obviously, no construction had begun as of this date which was beyond the date the lease was contemplated to have begun under the original lease. Mr. Benedetto complained on numerous occasions to Wanat and Girouard concerning the lack of progress all attributable to the defendant. There is no evidence of any delay caused by Benedetto.
Mr. Girouard put the project out to bid and it was awarded to Michael Krasun and his company, American Saloon Company. This company was brought to the attention of the parties by Mr. Girouard, who vouched for their competence. Mr. Benedetto, also in June of 1998, contracted with Krasun to do the interior work on his behalf. Benedetto made a $25,000 down payment on August 13, 1998, on his agreement with Krasun which was valued at $156,000 to $160,000. Krasun agreed to finance a major part of the balance. Little progress in construction was made before September of 1998.
By that time, Girouard had become dissatisfied with Krasun as to his integrity and work performance, and he advised Wanat to get rid of him. Apparently, he had now heard some bad things about Krasun's reputation. Wanat removed Krasun on October 29, 1998. As of that time, some walls were up and the first wood portion of the roof had been installed but the building was not ready for the interior work to begin.
Because of all the delays and the uncertainty of when the restaurant might open, Mr. Benedetto began to look at other properties to house his restaurant and eventually found a property in Milford. He had sought the assistance of Mr. Girouard to find a new location. Benedetto on his own attempted to find a tenant to take over the lease with Wanat. He was unsuccessful. There is no question that he asked Wanat and Girouard to help in finding a new tenant for the defendant's Black Rock Turnpike property. It is equally clear that he never told anyone that he would not go through with the deal. He testified that he had too much money into the property at that time, which amounted to over $130,000. He denied ever saying that he was financially unable to complete the project, and based on the evidence, the court finds that he was in fact able to CT Page 9813 conclude the project.
Mr. Wanat at one time had an opportunity to sell his property and offered Benedetto $15,000 if he walked away from the project. Benedetto refused. Wanat then told him that if he, Wanat, got a new tenant on the same terms as the Benedetto deal that he would give him his deposit back. Mr. Wanat continued to ask Benedetto for the balance of the loan in the amount of $25,000, which Wanat claimed he needed to do the paving work on the subject property and which he would require before continuing to do business with Benedetto.
Mr. Benedetto was still ready, willing and able to conclude the transaction if no new tenant took over his obligation. He was still going to use Krasun but could not begin his interior phase of the construction because the building simply was not ready for it. He had already picked out his fixtures, colors and sign and had talked to another contractor in the event that Krasun was not available. As a result of running the Arizona Flats restaurant, he had ample staff to run both operations.
From this point to the next significant event on December 11, 1998, it is unclear what if any progress had been made on constructing the building. On December 11, 1998, Mr. Girouard called the Benedettos at home and spoke to both Stanley and Norine Benedetto. There is some disagreement as to what was said. The Benedettos claim he told them he had great news or an early Christmas present. He advised them he had found a new tenant for the Wanat property on the same terms as theirs and they would be getting their money back. Girouard recalls the conversation and remembers saying the new tenant was taking over the same terms as theirs, but he denied saying that they would get their money back. The new tenants were a Jocko Saltus, Becky Greenberg and Craig Watson. Benedetto testified to a later conversation in December with Girouard wherein he reiterated that he would be getting his money back. Girouard does not recall that conversation. Stanley Benedetto and Mr. Wanat both testified that Wanat had said on several occasions that if he got a new tenant on the same terms as the Benedetto lease that he would refund their deposit. He repeated that after he was involved with the new tenants.
Based on the representation by both Wanat and Girouard that he would get his money back, Benedetto did nothing to prevent Mr. Wanat from signing a new lease with the new tenants. He said he never would have agreed to the substitution without that commitment. Otherwise, he would have completed the transaction himself. Mr. Wanat and his new tenants, Saltus, Greenberg and Watson did not enter into a new lease until February 10, 1999. That lease, defendant's exhibit B, in fact changed at least two terms in the amended lease between Benedetto and Wanat. CT Page 9814 Firstly, the monthly rental for the first five years was reduced from $5,400 to $5,300 monthly and, secondly, the non-refundable deposit was reduced from $100,00 to $75,000. At no time from December, 1998 until the lease signing on February 10, 1999, did either Girouard or Wanat ever tell any of the Benedettos of these changed terms, so they could protect their interests. It was only in March of 1999, when Benedetto asked Wanat for the return of his $75,000, that Wanat advised him of the different terms of the new lease, additional construction costs and the fact that he would not be returning any of the money.
This suit resulted. The complaint contains five counts. In the First Count, the plaintiff is alleging a breach of the lease based on the reletting of the premises to a third party thus depriving the plaintiff of her opportunity to perform the lease. The Second Count claims a violation of the covenant of good faith and fair dealing. The Third Count claims a violation of CUTPA (Connecticut Unfair Practices Act); and the Fourth Count claims unjust enrichment in the amount of $75,000 representing the $100,000 down payment less the $25,000 still owed on the oral promise to pay $70,000; and the Fifth Count alleges that the $100,000 non-refundable deposit was unreasonable and void.
The defendant filed an Answer, Special Defense and Counterclaim on August 23, 1999. The Counterclaim in three counts alleges in the First Count a breach of contract based on her inability to go through with the lease; in the Second Count fraudulent representations concerning the plaintiff's experience in the restaurant business; and in the Third Count conversion of $25,000.
Thereafter, on September 29, 1999, the defendant filed a Cross Claim against Stanley and Norine Benedetto in three counts mirroring the three counts of the counterclaim.
The court will deal with the Counterclaim and Cross Claim first and because the counts mirror each other will discuss the counts only once.
In the First Counts, the defendant alleges breach of contract and alleges that as of December, 1998, he had performed all obligations under the contract and had constructed the agreed upon restaurant to conclusion. He has totally failed to prove that. He further claims that the third party defendants failed to come up with the necessary money to meet the contract obligation and have failed to come up with the full non-refundable deposit. Wanat has failed to prove that. The full deposit was made on December 7, 1997. The third party defendants have proved they had the wherewithal to conclude the transaction if they were given that opportunity. CT Page 9815
As to the Second Counts, they each claim fraudulent misrepresentation as to prior restaurant experiences and financial ability of the plaintiff and third party defendants. No evidence was offered to support either claim. It was always understood that Stanley Benedetto was the real party in interest and he had more than ample restaurant experience.
As to the Third Counts sounding in conversion, the defendant Wanat seems to be saying somehow the third party defendant converted $25,000 to their own use. Wanat claims he loaned the third party defendants money from the non-refundable deposit on the lease "to assist in closing business dealings which would then enable the Third Party Defendants to complete this transaction." Nothing could be further from the truth. In April of 1998, four months after the signing of the lease and the payment of the full $100,000 deposit, the defendant loaned Stanley Benedetto $70,000 to assist him in purchasing the Arizona Flats restaurant and he knew of its purchase. Wanat has been repaid $45,000 on that oral promise to pay. It has nothing to do with this lease. He may have a cause of action for nonpayment of a portion of that claim, but that claim has not been made in this case. There is no conversion.
Therefore, judgment shall enter for the plaintiff, Jennifer Benedetto, on all counts of the counterclaim and for the third party defendants, Stanley and Norinne Benedetto, on all counts of the crossclaim.
It is clear from reading the parties' post-trial briefs that this case is fact driven and its outcome relies heavily on the court's determination of the credibility of the witnesses. The defendant's seven page brief contains no citation of authority for any of the claims made therein. The plaintiff's brief, though longer and with some citations, spends too much of its time on matters it has not plead and which the court must therefore ignore.
The disposition of this case rests almost exclusively on the question of breach of contract and whether one or both parties are in breach. The court, of necessity, is left to determine the case on the basis of what has been pled. Before embarking on that exercise, the court feels compelled to discuss paragraph 11 of the plaintiff's First Count which reads as follows:
 In or about December 7, 1997, the plaintiff paid to the defendant the $100,000.00 deposit referred to in paragraph 37 of the lease. Defendant subsequently agreed to reduce the deposit to $75,000 and returned a net total of $25,000.00 of that deposit to the plaintiff for her use.
CT Page 9816 That allegation apparently arises from the following evidence adduced at trial. The plaintiff did pay the full $100,000 deposit on December 7, 1997, on the signing of the lease. Thereafter, in April of 1998 the defendant loaned Stanley Benedetto $70,000 to assist him on his purchase of the Arizona Flats restaurant of which sum he repaid the defendant $45,000, leaving a balance of $25,000 unpaid.
Curiously, both sides seem to accept the fact that that loan of $70,000 was from the same funds that made up the $100,000 deposit and therefore, because Benedetto only paid back $45,000 of the loan of those funds, that the non payment of the $25,000 balance somehow reduced the deposit to $75,000. Both parties have adopted that scenario and the plaintiff is only asking for the return of $75,000. The court would have found that the loan was a totally separate transaction and had no effect on reducing the original deposit and therefore, if it concludes that the plaintiff has proven any of its claims, it would be entitled to the return of $100,000. Because it has not been pled that way and the consistent claim has only been for the return of the $75,000 deposit, the court is bound by that and can award no more.
Returning to the First Count itself, the plaintiff in paragraph 14 alleges the "Defendant's reletting of the premises to a third party constitutes a breach of the lease and prevented plaintiff from performing her obligation under the lease." That is the only claimed breach of the lease in the pleadings and the court is limited by it.
In her brief, the plaintiff Jennifer Benedetto claims that the defendant's failure to complete the construction of the building in reasonable time constituted a breach of the lease. That has never been pled and the court, therefore, will not consider it. The court must deal directly with the claimed breach of contract that by reletting the premises to third parties the defendant prevented the plaintiff from performing her obligation under the lease. The court concludes that the plaintiff has proven that claim.
There is no question that the plaintiff had every right to be frustrated by the continuing delays in the construction of the restaurant building. As a result, the plaintiff, acting through the third party defendants, began to look for someone to assume their obligation under the amended lease and asked both the defendant and his agent Mr. Girouard to seek a replacement. They made it clear, however, that any new tenant must assume the same terms as their obligation was to the defendant and that they would get their deposit back from him. That was understood by everyone. Otherwise, the plaintiff would fulfill the lease which the court has already found she was able to do. They simply were not going to walk away from the deposit, the $5,000 they had paid to Mr. Girouard and CT Page 9817 the $25,000 they had given Krasun as a deposit. The defendant's own brief confirms that when on page four it states, "There is no dispute that the Defendant had agreed to return the remaining deposit if the same deal and terms were in place with the new tenant."
From that clear understanding, the following facts are found. On December 11, 1998, Mr. Girouard initiated a call to the home of Stanley and Norinne Benedetto heralding the great news and early Christmas present that a new tenant had been found on the same terms as theirs. It would hardly have been great news if the new tenants were going to cost the plaintiff her $100,000 deposit. They both testified that Girouard assured them that the Benedetto's would be getting their deposit back. Girouard agrees with the first part of the conversation but denies that he said they would get their money back. The court concludes that he made all the statements. The Benedetto's further testified that the defendant, on at least three occasions when he was having lunch at their restaurant, Arizona Flats, stated that the terms were the same and they would be getting their deposit back. None of these representations was reduced to writing, and the plaintiff certainly did not give the defendant any release of her rights under the lease. The plaintiff and third party defendants obviously relied on those statements.
The new proposed tenants were Jocko Saltus, Betty Greenberg and Craig Watson. It would appear that from December 11, 1998, they continued their negotiations with the defendant and some of the terms of their original commitment changed. By the time they actually signed a lease with the defendant on February 10, 1999, the deposit had been reduced from $100,000 to $75,000 and the monthly rental for the first five years of the lease had been reduced $100 per month for a total of $6,000.
What is absolutely clear is that neither the defendant nor anyone on his behalf ever advised the plaintiff of these changes so that she could exercise her rights under he lease with the defendant. Further, the defendant's subsequent position was that he would now not refund any of the plaintiff's deposit. This even though his out-of-pocket losses because of these changes would only amount to a total of $31,000. Nothing was communicated to the plaintiff until some time in March when Stanley Benedetto asked the defendant for the return of the deposit and he was refused.
The clear understanding of the parties was that unless the new tenant assumed all of the obligations under the plaintiff's lease and the deposit was returned, that the plaintiff would fulfill her lease obligations. The defendant when it signed the lease with the new tenants on less favorable terms without advising the plaintiff and then refused to return her deposit has breached his contract with the plaintiff. What CT Page 9818 he wants to end up with is the plaintiff's $100,000 deposit and the new tenants $75,000 deposit. The court finds that the plaintiff has proved the allegations contained in the First Count of the complaint. The court has reviewed the three Special Defenses directed to all counts and finds none of them to have been proved.
As to the Second Count for breach of the covenants of good faith and fair dealing, the court will not address this based on its finding as to the First Count. If there is a difference, it is not sufficiently obvious.
As to the "CUTPA" claim in the Third Count, judgment will enter for the defendant. The court does not find proven the elements of a CUTPA claim based on the evidence offered.
As to the Fourth Count claiming unjust enrichment, the plaintiff's brief does not discuss that issue or provide any citations of authority. Based on the finding of the court as to the First Count, the court will not determine this count.
As to the Fifth Count, the plaintiff has offered no evidence at trial nor briefed the issue and therefore judgment shall enter for the defendant.
As for damages, the plaintiff has asked for the return of $75,000 representing the deposit on the lease. The court will award that sum. The plaintiff has also asked for an additional sum of $5,000 she spent on plans prepared by Mr. Girouard. That was never discussed by the parties and no representations were ever made concerning it. The court will not award damages for it.
Judgment will therefore enter for the plaintiff against the defendant for $75,000. On the question of interest, the court finds it is appropriate in this case and interest at the rate of ten percent (10%) is awarded to commence as of March 1, 1999.
GORMLEY, J.